[Civ. No. 11406. First Dist., Div. One.—April 21, 1941.]

ADA LEA CHRISTIANSEN, as Administratrix, etc., Respondent, v. HARRY HOLLINGS, Appellant.

Hadsell, Sweet, Ingalls & Lamb for Appellant.

Arthur Joel and James Martin MacInnis for Respondent.

PETERS, P. J.—Plaintiff, as administratrix of the estate of her husband, brought this action to recover damages for his wrongful death. She sues on her behalf, and on behalf of the three sons of decedent. From a judgment for plaintiff for $8,000 damages, entered upon a jury verdict, defendant prosecutes this appeal.

Defendant contends that the evidence, as a matter of law, demonstrates that he was free from negligence, and that the decedent was guilty of contributory negligence; that the court erred in giving certain instructions; and that the court erred in admitting certain evidence over defendant's objections.

The facts are as follows: Just before 8 A. M. on the morning of February 8, 1938, defendant parked his Plymouth sedan on the east side of Third Street north of Twenty-Second Street in San Francisco. Third Street at this spot is a busy, paved street, with sidewalks on either side, and streetcar tracks in the middle. The automobile was parked parallel to the curb facing north. There are several driveways cut into the curb in that block, and defendant had parked so that the right wheels of his car were over the curb and up on the sidewalk.

Plaintiff's husband was employed as a switchman and engine fireman on the Belt Line Railway. On the morning in question he was driving his Chevrolet sedan north on Third Street. He had with him his daughter-in-law, Anita Christiansen, and a friend. It was his custom to ride the girls to work each morning. Anita Christiansen testified as plaintiff's only witness to the facts of the accident, the other girl not having seen what occurred. According to her testimony,

they were proceeding north on Third Street in the outside traffic lane close to the right curb at between fifteen to seventeen miles per hour, when, as the front of the Chevrolet reached the rear fender of defendant's parked car, the defendant opened the door of his car preparatory to alighting therefrom. The Chevrolet driven by the decedent struck the partially opened door, and caused the Chevrolet to be "jolted back and forth". The force of the impact threw the witness against the windshield, and caused the decedent to be thrown forward so that his stomach hit the steering wheel. According to the witness, the decedent made an exclamation and rubbed his stomach. He drove on several hundred feet and brought his car to a stop. It is a reasonable inference from the witness' testimony that the decedent was then in a daze. She testified that immediately after the accident he drove along until she told him to stop; that she had to tell him to stop three or four times; that he finally stopped some five feet from the curb; that he got out of the car and started to walk back towards defendant's car in the middle of the street against traffic; that she led him over to the sidewalk; that she had to ask him three or four times to take defendant's license number; that defendant refused to give his name. She further testified that they then got back into the Chevrolet and started to drive away; that the fender that had hit the door was rubbing against the tire; that they drove on about a block or two and stopped; that during this ride the decedent was rubbing his stomach; that when they stopped the decedent ran over to a vacant lot and got a board and placed it under the fender and "stumbled off to the curb"; that the two girls lifted the fender off the tire; that the decedent then drove the girls to work.

The evidence of the other witnesses, so far as necessary to be recounted, is that the decedent then drove to his place of work and changed into his work clothes. He was observed to stagger as he came down the stairs, and was unable to work, being in a dazed condition. Three fellow employees took him home, carried him into the house, undressed him and put him to bed. That evening Dr. Piero Albi, one of the physicians for the decedent's employer, examined the decedent. He found that the decedent had high blood pressure, and was suffering from a degenerative disease of the heart. He found no objective sign of abdominal injury. He prescribed rest

and digitalis. It was agreed that the wife should report daily to the doctor by telephone giving him, particularly, the pulse beat of the injured man. The plaintiff testified that she followed the doctor's orders as to administering digatalis and telephoning every day until February 14, 1938.. On that day she informed Dr. Albi that his services were no longer desired and that they were going to have a Christian Science practitioner treat the injured man. The practitioner treated decedent until his death, which occurred on February 19, 1938. The coroner's autopsy gave as the causes of death (1) acute peritonitis; (2) acute appendicitis; (3) aortic stenosis; (4) chronic parenchymatous nephritis; and (5) arteriosclerosis.

Doctor Adolphus Berger, who had not treated decedent, was called as an expert witness. In response to a hypothetical question he testified that, in his opinion, peritonitis as a result of an acute appendicitis attack was the cause of decedent's death; that the blow received by the deceased in the accident aggravated or lighted up a dormant pre-existing chronic appendix; that death was caused by traumatic peritonitis.

From this evidence, it is clear that, whether defendant was guilty of negligence in opening the door of his car in the stream of traffic in the fashion he did, or whether the decedent was guilty of contributory negligence in driving too close to the parked cars, were questions of fact for the jury. Defendant testified that he looked in the rear view mirror of his car and observed traffic in back of him for a distance of some two hundred feet. Apparently the jury disbelieved this testimony, and for good reason. If the defendant had looked in his rear view mirror as he opened the door of his car, and, if the mirror was properly adjusted, he must, inevitably, have seen decedent's approaching automobile. Defendant admittedly did not look out the window of his car before opening the door, a precaution that the jury might well have found was reasonable under the circumstances, particularly in view of the traffic conditions on Third Street. Whether the injury was proximately caused by the negligence of the defendant, or whether the decedent's negligence, if any, contributed to the accident, were clearly jury questions that cannot, and should not, be disturbed on this appeal.

338

■ Defendant urges prejudicial error in the giving of certain instructions. He objects to the court having instructed the jury that, " . . . Section 525 of the Vehicle Code, as the same was in force and effect on the 8th day of February, 1938, reads in part as follows:

" 'Upon all roadways of sufficient width a vehicle shall be driven upon the right half of, and as close as practicable to the right-hand curb or edge of, such roadway.' "

Defendant contends that, as given, the instruction is a mandatory requirement that a vehicle be driven as close as practicable to the right-hand curb. He also objects to the failure of the court to instruct on the following portions of section 525 which follow the portion of the section above quoted: "except as follows:

"(a) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement.

"(b) When placing a vehicle in a lawful position for, and when such vehicle is lawfully making, a left turn."

It is quite clear that subsection "b" above-quoted has no application to the facts here involved. Nor is subsection "a" applicable. The defendant's car was parked, so that the decedent's car was not "passing another vehicle proceeding in the same direction."

There can be but little doubt that the portion of section 525 of the Vehicle Code that was read to the jury is applicable to the facts here involved. The section, except when facts exist to bring it within the exceptions, applies to any person driving on the right-hand side of the street, and was passed for the benefit of the person so traveling as well as for the benefit of others rightfully on that side of the street. It requires the driver of a vehicle to drive as close to the right-hand curb as is practicable except under circumstances not involved here. Appellant relies on *Polk* v. *Weinstein*, 12 Cal. App. (2d) 360 [55 Pac. (2d) 588], as establishing error in the giving of the instruction. In that case it was contended that the plaintiff was guilty of contributory negligence, as a matter of law, for the reason that when hit he was driving on his own side of the street twenty-five feet from the right-hand curb. The defendant was driving on the wrong side of the street in the opposite direction to that in which plaintiff was traveling. The court held that the section has

no application to vehicles traveling in opposite directions. The same result was announced in *Arundel* v. *Turk*, 6 Cal. App. (2d) 162 [44 Pac. (2d) 383]. In *Skulte* v. *Ahern*, 22 Cal. App. (2d) 460 [71 Pac. (2d) 340], it was held that the reasoning of the two cases above-cited only applies when the vehicles are proceeding in opposite directions. It was further held that where an automobile being driven on the right-hand side of a street hits a pedestrian, the section should be read to the jury. Negligence of the automobile driver was found to exist because he did not follow the mandate of the section. In the instant case, one of the major contentions of the defendant was that the decedent was guilty of contributory negligence in traveling too close to the parked car. The law required the decedent to drive "as close as practicable" to the right-hand curb, and the plaintiff was clearly entitled to an instruction so informing the jury. Of course, the statute did not establish, as a matter of law, that the decedent was not guilty of contributory negligence. Whether it was "practicable" for the decedent to drive as close to the parked car as he did was a question of fact, and the jury was so instructed. For example, at the request of defendant, the jury was instructed "that it was the duty of decedent, Henry Christiansen, in passing to the left of vehicles parked on Third Street at the time and place in question to exercise ordinary care to pass at a safe distance to the left thereof". Several other instructions were given on the same general subject. It is clear that the jury was fully and properly instructed on the issue under consideration.

 It is next urged that error was committed in admitting into evidence, over appellant's objection, a mortality table, and in giving an instruction based thereon. The court admitted into evidence a mortality table containing the life expectancy periods applicable to the heirs of the decedent, and, applicable to a man of 65 years, the age of decedent at the time of his death. An instruction was given to the effect that, "according to the American Tables of Mortality, a person of the age of 65 years has an expectancy of life for an additional 11.10 years . . . ". It is contended that it was error to admit the evidence, and to so instruct the jury, because the evidence showed that the decedent was not in average good health, but had a bad heart and a diseased kidney condition. While it is true that the evidence shows

that the deceased was suffering from these ailments, the evidence proffered by plaintiff is susceptible of the reasonable interpretation that, had it not been for the blow received by the decedent, he would not have died when he did. The evidence also shows that up until the day of the accident the deceased was working at his place of employment without difficulty.

It will be noted that appellant objects first to the admissibility of the tables into evidence, and, secondly, to the instruction. There can be no doubt of the admissibility of the table into evidence. No cases are cited by appellant that hold that such evidence is inadmissible. On the other hand, in *Groat* v. *Walkup Drayage etc. Co.,* 14 Cal. App. (2d) 350, 359 [58 Pac. (2d) 200], it was expressly held that, even though the evidence shows that the person injured was not in average good health, such tables are admissible even against the specific objection that the evidence shows that the injured person was not in average or ordinary health. (See, also, *Scott* v. *Sheedy,* 39 Cal. App. (2d) 96 [102 Pac. (2d) 575].) In 116 A. L. R. 416, there is an exhaustive annotation on the subject. At page 417 the rule is stated that: "According to the weight of authority, lack of normal health in a person whose life expectancy is sought to be determined does not render such tables inadmissible in evidence, it being frequently pointed out in these cases that such ill-health or disease goes only to the weight of the evidence and not to its admissibility." The statement is supported by cases from many states.

In the present case, when the table was offered containing not only the average life expectancy of a man of the age of 65, but also the life expectancy of the heirs of the deceased, the appellant made the following objection: "I am not certain whether this objection is good, I make the objection that it is incompetent, irrelevant and immaterial; I wish to make a record at this time." ■ The rule is elementary that such a general objection is sufficient only if the evidence is absolutely inadmissible for any purpose, and that where the evidence is objectionable only on special grounds, such grounds must be specified—otherwise they are waived. (*Brumley* v. *Flint,* 87 Cal. 471 [25 Pac. 683]; *Toomes* v. *Nunes,* 24 Cal. App. (2d) 395 [75 Pac. (2d) 94].) ■ But reliance need not be had upon this technical rule. Under the Groat case

the evidence was admissible even in the face of a specific objection. Appellant's objections go to the weight, not to the admissibility of the evidence.

 The evidence having been admitted properly, the plaintiff was entitled to an instruction based thereon. It is true that the appellant was entitled to a qualifying instruction to the effect that in estimating the probable length of a particular man's life, as compared with the average length of life as disclosed by the mortality tables, the individual's state of health, occupation, habits and surroundings, as disclosed by the evidence, must be taken into account. (*Groat* v. *Walkup Drayage etc. Co.*, supra; *Scott* v. *Sheedy*, supra.)

 Under the circumstances of this case, however, the failure to give such a qualifying instruction did not constitute reversible error. The appellant made no request for any such instruction, and does not challenge the amount of the verdict. For these reasons he cannot now complain of the failure of the court to give the qualifying instruction. 

In *Murphy* v. *National Ice Cream Co.*, 114 Cal. App. 482 [300 Pac. 91], the mortality tables showed that the life expectancy of a person of plaintiff's age was 18.9 years. The trial court instructed the jury that the jury should first find if the claimed injuries were permanent and then stated that (p. 486), "in this connection I instruct you that if you do find her injuries to be permanent the life expectancy of the plaintiff Ellen E. Murphy is eighteen years." Note that this was a positive, unequivocal instruction which, in effect, took the determination of this question of fact from the jury. Nevertheless, the court held that this was not reversible error. In so holding, the court, at page 487, stated the proper rule as follows: "The term 'life expectancy' as used in the instruction here given was sufficiently accurate to express that which the tables of mortality showed (*Belmer* v. *Boyne City Tanning Co.*, 160 Mich. 669 [125 N. W. 726]), and consequently the jury was informed in effect that if Mrs. Murphy was permanently injured, her life expectancy as shown by said tables was eighteen years; but of course, in the form the instruction was given, it cannot be approved, because it was still a question of fact for the jury to determine whether on account of those injuries she was removed from the general classification established by said tables. However, it does not follow for several reasons that a reversal is warranted on that

ground, for in the first place it is held generally that in the absence of a request for more specific instructions it is not reversible error for the court to instruct the jury that life tables might be considered as evidence of the life expectancy of a person, without instructing further that it should take into account in this respect all the evidence relating to the health and physical condition of such person. [Citing many cases]. . . . And in the present case, no such request was made, nor was any instruction whatever proposed by defendants upon the subject.

"Furthermore, it is a matter of common knowledge that the length of the life of a person cannot be definitely known (*People* v. *Burns,* 138 Cal. 159 [60 L. R. A. 270, 70 Pac. 1087]) and of course is not subject to mathematical computation. Presumably the jury was composed of intelligent persons (*Ward Land etc. Co.* v. *Mapes,* 147 Cal. 747 [8 Pac. 426]), and must have realized that this was true. Consequently it is not unreasonable to assume that they understood the instruction to mean, as the court doubtless intended, that if it believed that Mrs. Murphy was permanently injured, it was to take the eighteen-year period set forth in said tables as a basis in estimating her life expectancy. And in any event, since defendants were found liable for the accident, plaintiffs were admittedly entitled to damages for the personal injuries suffered by Mrs. Murphy; and the instruction in question concerns only that element thereof based upon her life expectancy. Therefore, since as stated it is impossible to determine such life expectancy with any degree of certainty, and defendants make no point that the amount of the award is so disproportionate to the injuries inflicted as to demand a reversal upon that ground, we are not prepared to hold that the error complained of calls for a new trial. (*Lahti* v. *McMenamin,* 204 Cal. 415 [268 Pac. 644]; *Kirk* v. *Santa Barbara Ice Co.,* 157 Cal. 591 [108 Pac. 509].)"

In *Newman* v. *Campbell,* 23 Cal. App. (2d) 639, 641 [73 Pac. (2d) 1265], the same thought is expressed in the following language: "The mortality table was admissible and, although not conclusive, was evidence of the probable duration of her life. Under the evidence she was entitled to an instruction based upon her theory of the case. (*Groat* v. *Walkup Drayage etc. Co.,* 14 Cal. App. (2d) 350 [58 Pac. (2d) 200]; *Morrow* v. *Mendleson,* 15 Cal. App. (2d) 15 [58

Pac. (2d) 1302].) If the appellant desired an instruction explaining in more detail the weight to be given the elements fixing her life expectancy, as was the case in *Groat* v. *Walkup Drayage etc. Co., supra,* such an instruction should have been offered. This was not done, and in the circumstances appellant has no ground for complaint. (*Murphy* v. *National Ice Cream Co.,* 114 Cal. App. 482 [300 Pac. 91].)''

The conclusions reached in these cases are determinative of the point under discussion. The only case that is cited that can be interpreted as supporting the contention that the failure to give the qualifying instruction is error is *Morrow* v. *Mendleson,* 15 Cal. App. (2d) 15 [58 Pac. (2d) 1302]. In that case it was held that it was error to instruct the jury upon the mortality tables without qualification where the person involved was admittedly not in normal or average health at the time of the injury. Apparently, the court was of the opinion that error was committed unless the qualifying instruction was given. An examination of the case, however, discloses that the court did not hold that the giving of the instruction was prejudicial and therefore reversible error. The court first held that certain instructions dealing with the question as to who has the right-of-way at an intersection were prejudicially erroneous, and then held that the mortality table instruction (the wording of which does not appear in the opinion) was improper, and, in effect, ordered the trial court not to give such instruction on the new trial. At most, all that this case held was that the giving of an unqualified instruction based on the mortality tables is error. If that case were applicable here it would not necessitate a reversal unless it were also held that the giving of the instruction was prejudicial. ██ As already pointed out, the appellant does not attack the verdict as excessive. In fact, any such contention would be without merit. The deceased was earning over $2,300 annually at the time of his death. A person of average health of the decedent's age at the time of his death has a life expectancy of 11.10 years. The wife of decedent, who had a life expectancy of twenty-two years, and a fifteen-year old son, who had a life expectancy of forty-five years, were entirely dependent on the decedent for support. The jury fixed the recovery at $8,000—about the amount the decedent would have earned in three and one-half years. We must assume, as was pointed out in the *Murphy*

v. *National Ice Cream Co.* case, *supra,* that the jury was composed of reasonably intelligent persons. They must have known that life expectancy tables are based on average normal health, and are not conclusive as to the life expectancy of any particular person. That the jury must have considered the particular health of the decedent is conclusively demonstrated by the size of the verdict. We, therefore, hold that even if error was committed in the giving of the unqualified instruction, it was not prejudicial to defendant.

██ The defendant next complains of an instruction dealing with the duty of the decedent to use reasonable diligence in the care of his injury, and also dealing with the legal effect of his belief in the doctrines of the Christian Science Church. At the request of plaintiff the court instructed the jury that: "The Court instructs you that a person injured through the negligence of another has the duty to use ordinary and reasonable diligence in caring for his injuries and reasonable means to prevent aggravation of them and to effect a recovery. Such person is not required, however, to rely on a particular kind of treatment but such treatment as a reasonably prudent person might under all the circumstances have chosen.

"In determining whether Christiansen did act as a reasonably prudent person might have acted under the circumstances, you are entitled to consider, with all the other evidence, his conduct in the light of any conscientious belief in methods of treatment held by him, such as his belief in the doctrines of the Christian Science Church or healing by prayer and the extent to which he acted in accordance with such belief." At the request of defendant the court instructed the jury that, "I instruct you that it is the law that, if the injuries, if any, sustained by Henry Christiansen, the decedent, were such as to render, in the exercise of ordinary care on his part, medical, or surgical, treatment by a physician, or surgeon, reasonably necessary, or expedient, then the decedent was under the duty to use ordinary care to secure such medical, or surgical, aid, and he was also required to exercise ordinary care in the selection of a physician, or surgeon, of ordinary skill and experience, and while, in determining whether the decedent exercised such ordinary care, you may consider the fact that the decedent was a member of the Christian Science Church, or an attendant at such church,

that fact, or the religious beliefs, or practices, of the decedent did not relieve him from the duty of exercising ordinary care, in the light of all the circumstances of this case, in securing medical, or surgical, attention.'' Another instruction was given at the request of defendant reading as follows: ''Belief in any particular system of healing by faith or prayer, does not in and of itself, relieve an injured person from the duty of exercising ordinary care to bring about recovery from injuries suffered.''

Other instructions were given dealing with the duty of an injured person to use ordinary and reasonable diligence in caring for his injuries.

It seems to be the contention of defendant that the first two instructions are in conflict, in that it is contended the first told the jury that the injured person was not required to rely on a particular kind of treatment, while the second told the jury, to use defendant's own language, ''that decedent was under a duty to exercise ordinary care to secure medical assistance.'' It is also apparently urged that it was error to tell the jury it could consider the decedent's belief in the doctrines of the Christian Science Church in ascertaining whether he exercised due diligence in caring for his injuries. These contentions are without merit. If there is any error in the two instructions it is in the one offered by defendant, if that instruction should be interpreted as contended by him. As so interpreted, it was entirely too favorable to the defense. The proper rule was embodied in the first instruction above-quoted. Defendant concedes that the jury should have been instructed that the fact that the decedent was a believer in Christian Science could be taken into consideration in determining whether the decedent acted with reasonable care. He argues that the last sentence of the first paragraph of the first instruction above-quoted which reads: ''Such person is not required, however, to rely on a particular kind of treatment but such treatment as a reasonably prudent person might under all the circumstances have chosen'' in effect told the jury that the deceased was under no duty to seek medical care. Defendant seems to believe that the true rule is that a belief in Christian Science may permit the injured man to delay in securing medical treatment, apparently until relief has been sought and not obtained through Christian Science, but that such belief will not justify him in not securing medi-

cal care at all. Of course, in the present case, the decedent did seek medical care. He first called in a doctor, and, after the doctor had failed to give relief, called in a Christian Science practitioner.

The correct rule is that an injured person must use reasonable diligence in caring for his injuries. What is reasonable diligence depends upon all the facts and circumstances of each case. There is no hard and fast rule that the injured person must seek medical care of a particular type. Self-care may be reasonable under the circumstances, and the jury should be so instructed where that factor is relevant. (*McKinney* v. *Red Top Cab Co.*, 113 Cal. App. 637 [299 Pac. 113]; see, also, *Larson* v. *Blue & White Cab Co.*, 24 Cal. App. (2d) 576 [75 Pac. (2d) 612].) Similarly, if the injured party is a believer in Christian Science, the jury should be instructed, as it was instructed in this case, that such belief is a factor to be considered with all the other evidence in determining whether the injured person used reasonable diligence in caring for his injuries. If the injuries are such that a reasonably prudent man would seek medical care, such care must be secured. But where the injuries are not of such a nature, as in the present case, the jury may properly consider the religious beliefs of the injured person in ascertaining whether he exercised reasonable care. Certainly, the courts should not disregard the beliefs held by a large number of reasonable and intelligent people in passing on the efficacy of the curative means adopted by the injured person. (*Lange* v. *Hoyt,* 114 Conn. 590 [159 Atl. 575, 82 A. L. R. 486], see, also, cases collected in 82 A. L. R. 491; 15 Am. Jur., 436, sec. 37.) The charge given, in our opinion, was proper and correct.

Defendant also urges prejudicial error in the giving of plaintiff's instruction number 25, which, he contends, is a formula instruction that omits certain necessary elements. No useful purpose would be served by setting forth this instruction in this opinion. When the challenged instruction is read in its entirety it is clear that it was a proper instruction. Moreover, the jury was fully and fairly instructed in detail on the particular elements claimed to have been omitted. Defendant could not possibly have been prejudiced even if the instruction were defective. (*Mahoney* v. *Murray,* 140

Cal. App. 206 [35 Pac. (2d) 612]; *Flood* v. *Miura*, 120 Cal. App. 467 [8 Pac. (2d) 552].)

The only other contention of defendant is that his objection to the hypothetical question propounded to Dr. Berger should have been sustained because, it is claimed, the question was based, in part, on the conclusions of others. It is also urged that the question was "valueless because no proper foundation was laid and it was built upon the assumption of numerous facts not in evidence." The first part of this contention is based on the theory that the hypothetical question was based, in part, on the diagnosis of Dr. Albi, the attending physician, and on conclusions appearing in the testimony of others. It is urged that it is error for a hypothetical question to include the assumption of the correctness of opinions reached by someone else. The case of *Mt. Royal Cab Co.* v. *Dolan*, 168 Md. 633 [179 Atl. 54, 98 A. L. R. 1106], and 20 Am. Jur. 665, section 791, are cited as supporting this rule. It is, of course, the rule, as announced in the above case and text, that the opinion of an expert cannot be predicated on the opinion of another expert. But it is equally true that an expert may express an opinion based upon *facts* testified to by an expert, or upon tests made by other experts. In the present case, Dr. Albi was permitted to testify concerning his personal examination and diagnosis. The hypothetical question properly included the facts so disclosed. This is equally true of the facts testified to by the other witnesses. (*Missouri State Life Ins. Co.* v. *Fodrea*, 185 Ark. 155 [46 S. W. (2d) 638].)

Moreover, it is a well-settled rule that even when a hypothetical question improperly co-mingles with the statement of the facts opinion evidence of others, a reviewing court will not consider the objection unless at the trial the appellant called the attention of the trial court to the objectionable parts of the question. (*Borkheim* v. *Borkheim*, 65 Cal. App. 218 [223 Pac. 429]; *Travelers Ins. Co.* v. *Drake* (9th Circuit), 89 Fed. (2d) 47.) The record shows no objection to the question based on the contention now urged.

Defendant also makes the familiar contention that the hypothetical question did not include all the relevant facts. Obviously, a hypothetical question need not necessarily include a statement of all of the evidence in the case— a question may be properly framed upon any reasonable

theory of the questioning party. (*Coyne* v. *Pacific Mut. Life Ins. Co.*, 8 Cal. App. (2d) 104 [47 Pac. (2d) 1079].) Moreover, the appellate court is justified in placing considerable reliance upon the determination of the trial judge in passing on the sufficiency of the facts narrated in the question. (*Weaver* v. *Shell Company*, 34 Cal. App. (2d) 713 [94 Pac. (2d) 364]; *Graves* v. *Union Oil Co.*, 36 Cal. App. 766 [173 Pac. 618].) In addition, the record here shows that, after the question was asked of Dr. Berger, defendant objected on the ground that all facts were not included. Every relevant fact suggested by him was thereafter, with consent of plaintiff's counsel, included in the question. Defendant is in no position now to claim that other facts not included should have been included. (*Coyne* v. *Pacific Mut. Life Ins. Co., supra.*)

It was urged on the oral argument, and somewhat imperfectly in the briefs, that the hypothetical question, which was intended to ascertain the opinion of the expert as to the cause of death, assumed the very fact in issue. This is incorrect. A fair reading of the question discloses that it was based on the relevant facts, and did not assume the fact in issue.

A reading of the record demonstrates that defendant was accorded a full and fair trial. The jury was fully and fairly instructed. No substantial or prejudicial error was committed.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied May 21, 1941, and appellants' petition for a hearing by the Supreme Court was denied June 19, 1941.